IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| SANDRA B. KNIGHT, | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:19-cv-262** |
| | ) | |
| RYAN MCCARTHY, | ) | |
| Secretary of the Army | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

After retiring from her employment as a Suicide Prevention Program Manager with the

United States Army, plaintiff, Sandra Knight, filed these claims pursuant Title VII of the Civil

Rights Act of 1964 and § 501 of the Rehabilitation Act of 1973. Specifically, plaintiff has

alleged gender discrimination, disability discrimination, failure to provide reasonable

accommodation for her disability, retaliation based on her prior Title VII-protected activity,

creation of a hostile work environment, and constructive discharge, all of which arose out of the

treatment plaintiff received from her supervisor, Wayne Johnson, in the eight months prior to her

retirement. Following full discovery, defendant filed a motion to dismiss plaintiff's constructive

discharge claims pursuant to Rule 12(b)(1), Fed. R. Civ. P., and a motion for summary judgment

on all of plaintiff's claims pursuant to Rule 56, Fed. R. Civ. P. Defendant's motions have been

fully briefed and argued orally, and thus are now ripe for disposition.

For the reasons that follow, plaintiff's constructive discharge claims must be dismissed

for lack of jurisdiction. In addition, plaintiff has not identified triable issues of fact as to her

gender discrimination claim, disability discrimination claim, failure to accommodate her

disability claim, or her gender and disability-based hostile work environment claims. By

1

contrast, plaintiff has produced sufficient record evidence to create a triable issue of fact as to her retaliation-based hostile work environment claim. Accordingly, summary judgment must be entered in favor of defendant on all claims except plaintiff's retaliation-based hostile work environment claim.

# I.

The entry of summary judgment is appropriate only where there are no genuine disputes of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, it is important to identify the record facts as to which no genuine dispute exists. In this regard, Local Rule 56(B) directs a movant for summary judgment to include in its submission a separately captioned section listing in numbered-paragraph form all material facts as to which the movant contends no genuine dispute exists; the nonmovant must then respond to each paragraph citing admissible record evidence to establish a genuine dispute of material fact. In this case, both parties have substantially complied with the Local Rule. Accordingly, the facts recited herein are derived from defendant's list of material facts and plaintiff's response to those facts, incorporating plaintiff's disputes where relevant and material.

1. Plaintiff began working for the Army in 1984.

2. On May 11, 2009, plaintiff began working as a social worker in the Alcohol and Substance Abuse Program ("ASAP") at the United States Army Garrison ("USAG") Red Could near the Korean Demilitarized Zone ("DMZ").

3. In 2010, Plaintiff was unable to meet the requirements of her clinical social worker position because she failed her licensing examination.[1] Wayne Johnson then offered her a position as a Prevention Coordinator in the non-clinical portion of the ASAP program under his supervision.

---

[1] Plaintiff disputes that she failed to meet the licensing requirements, but plaintiff's own deposition testimony clearly establishes that she failed the licensing exam. *See* Dkt. 51-2, at 8-9 ("Q: And why did you leave the position [as a clinical social worker]? A: As clinical – because I did not have an independent license. Q: A license as a social worker? A: As a social worker…Q: You did sit for the actual [licensed social worker] exams? A: Yes, I did. Q: And did you pass the actual exam? A: No.").

4. Wayne Johnson supervised plaintiff in her position in the ASAP program at USAG Red Cloud for some period of time prior to August 2010.[2]

5. Plaintiff described Johnson's supervision of her during this time period in 2010 as "controlling, rigid, territorial." Specifically, plaintiff stated that Johnson made her do a "lesson plan practice," made her "sit in the class he taught," and reviewed her work.[3] This was the first time that Johnson supervised plaintiff's work, and it was the first time that plaintiff was employed as a Prevention Coordinator.

6. In August 2010, Johnson transferred to USAG Yongsan, a separate garrison located in Seoul, over an hour away from USAG Red Cloud.

7. Employees under Johnson's supervision at USAG Yongsan almost uniformly reported that his management style was "authoritarian," "dictatorial," "micro-managing," and "my-way-or-the-highway."[4]

8. Plaintiff did not interact with Johnson in-person after he transferred to USAG Yongsan. Plaintiff asserts, however, that she provided a witness statement in the Equal Employment Opportunity Commission ("EEOC") cases of Skytina Felder-Jones and Lorraina Nyanza, two of Johnson's employees at USAG Yongsan. The records of Felder-Jones's and Nyanza's EEOC complaints do not contain a witness statement from plaintiff.[5]

9. Plaintiff testified that, in April and May 2011 Johnson called her and threatened her not to participate in Felder-Jones's and Nyanza's EEOC complaints.[6] Johnson

---

[2] Plaintiff disputes the supervision timeframe proposed by defendant—May 2010 to August 2010. Review of the summary judgment record shows no consensus as to when Johnson's supervision of plaintiff began, only that Johnson supervised plaintiff for some period of time prior to being reassigned to USAG Yongsan in August 2010.

[3] Dkt. 51-2, at 11-15.

[4] The AR-15 reports in the summary judgment record also discuss specific instances of Mr. Johnson's improper conduct as a supervisor at USAG Yongsan, including derogatory statements Mr. Johnson allegedly made to female co-workers about their appearance and their attire. See Dkt. 51-2, at 163-195.

[5] Although the summary judgment record does not contain a witness statement from plaintiff in these EEOC cases, Ms. Nyanza's investigation file mentions plaintiff multiple times as someone with whom Ms. Nyanza discussed her claims. See Dkt. 60-14. In addition, Anna Revere, an EEOC officer in the Army assigned to Korea, testified during her deposition that she remembers plaintiff was listed as a witness in Ms. Felder-Jones's EEOC case, but Ms. Revere could not remember if plaintiff ever testified in that case. See Dkt. 60-21, at 9. Ms. Felder-Jones also submitted an affidavit stating that plaintiff was a corroborating witness in her EEOC case. See Dkt. 60-6, at ¶ 27.

[6] A September 10, 2019 affidavit from plaintiff's husband, Andri Knight, states that Mr. Knight was present when plaintiff received a call from Johnson at some point in 2011, that Johnson was talking loudly enough that he could hear what Johnson was saying, and that Johnson threatened plaintiff with harm if plaintiff were involved in the complaints against him. See Dkt. 60-7, at ¶ 6.

3

testified that he had no knowledge of plaintiff's participation in these EEOC cases and did not make any such call.[7]

10. Plaintiff asserts that she was so concerned about Johnson's purported calls that when she saw a white Mercedes sedan a few months later,[8] she had a panic attack because she thought that Johnson might be in the car.

11. In May 2011, plaintiff applied for a position at USAG Yongsan. Johnson was tasked by his supervisor to review the resumes submitted for that position and to create the matrix used to rank the candidates. Johnson was not the selecting official for the position, but Johnson's supervisor was the selecting official. After plaintiff was not selected for the position, she filed an EEOC complaint asserting that Johnson retaliated against her by selecting another individual for the position because of plaintiff's involvement in Felder-Jones's and Nyanza's EEOC cases. Plaintiff's EEOC complaint was later resolved by an agreed settlement with plaintiff.

12. During this same time period, Johnson applied for a position in the United States at West Point and transferred there in August 2011.

13. While Johnson was at West Point, one of Johnson's male employees complained that Johnson spoke harshly to him, micro-managed him, insisted on knowing where employees were and what they were doing, forced him to open his boss's office and proceeded to yell at him in a "one-way conversation," and insisted that employees attend impromptu meetings without regard to the employees' schedules.[9]

14. On April 7, 2013, plaintiff became the Suicide Prevention Program Manager at USAG Red Cloud, where her supervisor was Carrie Hicks. Plaintiff described Hicks's management style as team-building focused, not as a micro-manager.[10]

15. Hicks's supervisor, Bud Rader, also contrasted Johnson's and Hicks's management styles. Rader stated: "Mr. Johnson's supervisory style was a lot

---

A September 10, 2019 affidavit from Ms. Felder-Jones states that around the time of Ms. Felder-Jones's EEOC complaint, plaintiff called Ms. Felder-Jones and told Ms. Felder-Jones that Johnson had threatened plaintiff to stay out of the EEOC investigation. *See* Dkt. 60-6, at ¶ 28.

[7] This dispute does not alter the result reached here because the analysis that follows assumes the veracity of plaintiff's version of events as the non-moving party.

[8] Plaintiff testified that Johnson drove a white Mercedes when he was her supervisor in 2010. *See* Dkt. 51-2, at 30.

[9] *See* Dkt. 51-3, at 50-52.

[10] Dep. of Sandra Knight, Dkt. 51-2, at 15 ("You were allowed to do your job…If you had any problems, you would come to [Hicks]. If [Hicks] had any problem, she would come to you. She was not a micro-manager. She was a team – a part of a team.").

4

different than [Hicks]'s, the previous ASAP m[anager]. Mr. Johnson is a, you know, a straight authoritarian type leader. He gives you a direction and expects you to follow it. [Hicks] was, you know, a much kinder gentler supervisor, if you will."[11]

16. From March 2015 to August 2015, plaintiff returned to the United States for back surgery.

17. On June 4, 2015, while plaintiff was still on leave, she called the Army Benefits Center to request a retirement estimate with a proposed retirement date of May 31, 2016. Plaintiff did not submit her retirement application until December 14, 2015.

18. In August 2015, Johnson was selected as the ASAP Manager at USAG Red Cloud, and thus again became plaintiff's first-line supervisor.

19. Plaintiff became aware that Johnson had been selected as the ASAP Manager at USAG Red Cloud on her first day back at work in August 2015.

20. Plaintiff immediately contacted USAG Red Cloud management and informed them that her prior EEOC settlement agreement contained a "no-contact" provision that precluded Johnson from supervising her.

21. USAG Red Cloud Garrison Commander Colonel Jack Haefner and Deputy Garrison Commander Steve Ryan contacted the Army's legal counsel to determine how to comply with the terms of the settlement agreement given that Johnson had been hired to supervise the division in which plaintiff worked. Haefner and Ryan learned that plaintiff's settlement agreement did not contain any provision regarding Johnson's contact with her, or his supervision of her.[12]

22. After becoming plaintiff's supervisor in August 2015, plaintiff asserts that Johnson took the following actions:

   a. In Johnson's first staff meeting on August 28, 2015, Johnson admonished the staff as a whole not to engage in gossip. Johnson did not reference plaintiff in his statement, but plaintiff interpreted his statement as directed

---

[11] Dep. of Herbert Rader, Dkt. 51-3, at 64.

[12] Anna Revere, an EEOC officer in the Army assigned to Korea, makes clear in her deposition testimony how inappropriate it was for the Army's counsel to share plaintiff's earlier EEOC settlement agreement with USAG Red Cloud management. *See* Dkt. 60-21 at 8 ("Q and why was that troublesome? A Well, number one, to make sure that we do not place a chilling effect on the EEO process and to ensure the Privacy Act, there are only people that have a need to know. Once the complaint is settled, it is settled Okay? The only people that should have been involved with any knowledge of that settlement should have been those parties involved…"). Whether there was a problem with Johnson supervising plaintiff under the terms of the settlement agreement could have been communicated without sharing the entirety of the settlement agreement with USAG Red Cloud senior management.

at her.[13]

b. In the same meeting, Johnson stated he was not aware of plaintiff's specific duties as Suicide Prevention Program Manager.

c. In the same meeting, Johnson told plaintiff that she could not attend a training session that involved travel because she was retiring soon.

d. In a second meeting, Johnson asked a male administrative assistant to retrieve a laptop from plaintiff's office because plaintiff had recently undergone back surgery.

e. In a third meeting, on September 14, 2015, Johnson interrogated plaintiff about the specific details regarding her plans for the Suicide Prevention Month Campaign, which was scheduled to begin in two weeks.

f. At the September 14, 2015 meeting, plaintiff asserts that she had a panic attack because of Johnson's tone and manner of questioning. Johnson then called a colleague, Dr. Joyce Clem, into his office. Thereafter, plaintiff left Johnson's office and called Rader, the head of human resources at USAG Red Cloud and Johnson's supervisor, to inform him of her panic attack, and Rader told plaintiff that she could take leave.

g. When plaintiff returned to work two days later, Johnson scheduled a meeting with plaintiff in his office. Plaintiff requested that Dr. Clem be present during their meeting, but Johnson refused to have anyone else present for the meeting.[14]

h. In another meeting, Johnson informed the entire staff that he did not want to hear the staff complaining when he issued directions.

i. In one staff meeting, Johnson requested plaintiff take the minute notes because plaintiff's female colleague, Soni Benson, was unavailable.

j. Johnson gave plaintiff a hard time for using the term "manager" in her email signature line as part of her job title, even though the term "manager" is in her position title. Johnson claims that this discussion was a result of plaintiff's assertion that Johnson did not have the authority to supervise plaintiff's suicide prevention program, which Johnson did have the authority to do.

---

[13] Plaintiff interpreted Johnson's statement as directed at her because she was the only person in the meeting who had contact with Johnson during his earlier stint in Japan and the only person who had knowledge of the EEOC complaints associated with that stint.

[14] See Dkt. 60-15, at 6-8.

    k.  Johnson called impromptu meetings that required plaintiff's attendance. Johnson also required plaintiff to inform him whenever she left the office and to inform him of her assignments every day.

    l.  Johnson insisted that, as Chief of the ASAP, he would be the primary interface with senior command officials, and that plaintiff brief him for meetings with senior command. Prior to Johnson becoming her supervisor, plaintiff had been the primary interface with senior command in some of these meetings.

    m.  On one occasion, Johnson asked plaintiff the date of an upcoming meeting with senior command officials. When plaintiff responded the date she "believed" was the next meeting, Johnson responded, "Did you just pull that out of thin air?"[15]

    n.  When Johnson learned that plaintiff maintained a cellular telephone with a 24-hour suicide crisis hotline, he asked plaintiff what qualification she had to staff that hotline. Johnson claims that he was concerned about the potential liability of plaintiff manning the crisis hotline with insufficient training and working hours that she was not paid. Johnson also claims that he was concerned that plaintiff's hotline was duplicative of another suicide crisis hotline.

    o.  Plaintiff testified that Johnson did not invite her, or her female colleague Soni Benson, to Thanksgiving dinner at his home, even though he invited the rest of the staff. Johnson testified that he extended the Thanksgiving invitation to the entire staff, including plaintiff.[16]

23. Throughout the time period during which Johnson supervised plaintiff, Johnson was authoritarian toward all employees and micro-managed all employees.

24. One of plaintiff's and Johnson's female colleagues stated in a sworn statement that plaintiff was "disrespectful, demanding, and insubordinate[e] in several staff meetings" whereas Johnson "remained composed and…asked Ms. Knight to speak with him after the meeting."[17]

25. During the time period that Johnson supervised plaintiff at USAG Red Cloud, from August 2015 until plaintiff's retirement in April 2016, plaintiff told Garrison Commander Colonel Jack Haefner and Deputy Garrison Commander Steve Ryan

---

[15] Dkt. 51-2, at 91.

[16] This dispute does not alter the result reached here because the analysis that follows assumes the veracity of plaintiff's version of events as the non-moving party.

[17] Dkt. 52-2, at 38.

that plaintiff and Johnson were getting along.

26. Plaintiff retired on April 29, 2016, about one-month prior to the retirement date plaintiff had inquired about in June 2015, before plaintiff had learned that Johnson would again be her supervisor at USAG Red Cloud.

27. On September 17, 2015, plaintiff filed an informal EEOC complaint in which she claimed that Johnson retaliated against her for her prior protected activity and discriminated against her on the basis of her disability of an anxiety disorder.

28. On December 28, 2015, plaintiff filed a formal EEOC complaint in which she claimed that Johnson retaliated against her for her prior protected activity and discriminated against her on the basis of her gender and her anxiety disorder disability. On June 1, 2016, an amendment letter was filed which added additional instances of Johnson's alleged discrimination and retaliation against plaintiff.

29. Plaintiff did not raise a claim of constructive discharge or involuntary retirement in either her informal complaint, formal complaint, or June 1, 2016 amendment to her complaint.

30. Throughout her employment with USAG Red Cloud, plaintiff never submitted any medical documentation regarding her panic or anxiety disorder to her managers or any paperwork requesting an accommodation for any disability.

## II.

As an initial matter, defendant has moved to dismiss plaintiff's constructive discharge claims pursuant to Rule 12(b)(1).[18] Because plaintiff has failed to exhaust her administrative remedies with respect to her constructive discharge claims, those claims must be dismissed for lack of jurisdiction.

Before filing suit under either Title VII or the Rehabilitation Act, a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC. 42 U.S.C. § 2000e-5(f)(1) (Title VII); *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (Title VII);

---

[18] Plaintiff has not separately alleged a constructive discharge claim in her complaint. Instead, plaintiff has alleged constructive discharge as part of her claims of retaliatory disparate treatment (Count 1), disparate treatment based on gender (Count 2), and disability discrimination (Count 3).

8

*Wilkinson v. Rumsfeld*, 100 F. App'x 155, 157 (4th Cir. 2004) (Rehabilitation Act).[19] A

plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit. *Smith v.*

*First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000) (citing *Evans v. Technologies*

*Applications and Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir. 1996)). Accordingly, a plaintiff's

lawsuit can assert only (i) the claims stated in the EEOC charge, (ii) claims reasonably related to

the claims stated in the EEOC charge, and (iii) claims that can be expected to follow from a

reasonable administrative investigation of the EEOC charge. *See id.* at 247-48 (citing *Chisolm v.*

*United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)). As the Fourth Circuit has

appropriately stated, "[t]his exhaustion requirement ensures that the employer is put on notice of

the alleged violations so that the matter can be resolved out of court if possible." *Miles v. Dell,*

*Inc.*, 429 F.3d 480, 491 (4th Cir. 2005). Importantly, the Fourth Circuit has made clear that

"constructive discharge is a discrete discriminatory act requiring administrative exhaustion."

*Spencer v. Ashcroft*, 147 F. App'x 373, 375 (4th Cir. 2005) (unpublished) (citing *Young v. Nat'l*

*Ctr. for Health Serv. Research*, 828 F.2d 235, 237-38 (4th Cir. 1987)).

Here, the undisputed record reflects that plaintiff never asserted any claim of constructive

discharge in her formal EEOC complaint, including in her request to amend her administrative

complaint on May 29, 2016, approximately one month after her retirement.[20] Plaintiff counters

that she asserted her constructive discharge claims in the declaration she submitted on October

---

[19] The Fourth Circuit has made clear that "Rehabilitation Act claims against the federal government must comply with the same administrative procedures that govern federal employee Title VII claims. Accordingly, administrative exhaustion is a condition precedent to suit…" *Wilkinson v. Rumsfeld*, 100 F. App'x 155, 157 (4th Cir. 2004) (internal citations omitted).

[20] Plaintiff's counsel emailed the Army EEOC officer a list of claims to be added to plaintiff's EEOC complaint on May 29, 2016. *See* DEX 39, Dkt. 52-1, at 2. The EEOC sent an amendment letter to plaintiff's counsel on June 1, 2016 that added a number of the claims enumerated in the May 29, 2016 email to plaintiff's EEOC complaint. *See* DEX 40, Dkt. 52-1, at 6. Neither the May 29, 2016 communication nor the June 1, 2016 communication contain any reference to a constructive discharge claim.

17, 2016 in connection with the EEOC investigation. This argument fails to rescue plaintiff's

constructive discharge claims as the Fourth Circuit has made clear that the "scope of the

plaintiff's right to file a federal lawsuit is determined by the [EEOC] charge's contents," not on

subsequent communications between the complainant and the EEOC. *Jones v. Calvert Grp., Ltd.*,

551 F.3d 297, 300 (4th Cir. 2009). Because the purpose of the administrative exhaustion

requirement is in part to provide notice to employers, correspondence between plaintiff and the

EEOC after the filing of plaintiff's formal EEOC charge, without any formal amendment to the

EEOC charge, cannot be considered in determining the scope of the EEOC charge.[21]

Accordingly, plaintiff failed to assert a constructive discharge claim in her EEOC charge, and

thus has not administratively exhausted the constructive discharge claims in Counts 1, 2, and 3 of

her complaint in this case.

Plaintiff further contends that her constructive discharge claims are reasonably related to

her original EEOC complaint and are inextricably intertwined with her retaliation claims. But

plaintiff has provided no record evidence to support this argument, nor is there any. Plaintiff

made her initial informal EEOC complaint alleging retaliation based on her prior protected

activity on September 17, 2015, three months before she submitted her retirement application.

Thus, it is abundantly clear that plaintiff's retaliation claims were independent of any

constructive discharge claim. Moreover, as discussed above, after plaintiff retired in April 2016,

---

[21] *See, e.g., Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 408 (4th Cir. 2013) ("[I]n determining what claims a plaintiff properly alleged before the EEOC, we may look only to the charge filed with the agency. We have noted that 'it would be objectively illogical to view a private letter from a complaining party to the EEOC as constructively amending a formal charge, given that one of the purposes of requiring a party to file charges with the EEOC is to put the charged party on notice of the claims raised against it.'") (quoting *Sloop v. Memorial Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999)); *Miles v. Dell, Inc.*, 429 F.3d 480, 492 (4th Cir. 2005) (holding that a letter that "explicitly alleged retaliation" sent by the plaintiff to the EEOC five months after she filed her complaint "does not cure her failure to allege retaliation in the charge and is insufficient to meet the administrative exhaustion requirement").

plaintiff's counsel sought to amend plaintiff's EEOC complaint on May 29, 2016, and did not even then raise any constructive discharge claim. Accordingly, the constructive discharge claims in plaintiff's complaint, which form part of Counts 1, 2, and 3, are not reasonably related to her original or amended EEOC charge.

In sum, plaintiff has failed to exhaust her administrative remedies with respect to her constructive discharge claims, and therefore those claims must be dismissed for lack of jurisdiction.

## III.

Defendant has moved for summary judgment on all of plaintiff's remaining claims. In this respect, the standard for summary judgment is too well-settled to require extensive discussion here. Simply put, summary judgment is appropriate when there is "no genuine issue as to any material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To serve as a bar to summary judgment, facts must be "material," which means that the disputed fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, at the summary judgment stage, courts must "view the evidence in the light most favorable to…the non-movant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

## IV.

Count 2 of plaintiff's complaint alleges discrimination and disparate treatment based on gender, in violation of Title VII. Because the summary judgment record does not establish that plaintiff suffered an adverse personnel action or that similarly situated employees outside the protected class received more favorable treatment, summary judgment must be entered in favor

of defendant on Count 2.

Plaintiff offers no direct evidence of gender discrimination by the legal decisionmaker,[22]

and therefore her claims are analyzed under the burden-shifting framework set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, a plaintiff must establish a

*prima facie* case of disparate treatment based on gender. To do so, a plaintiff must establish (1)

membership in a protected class; (2) satisfactory job performance; (3) an adverse personnel

action;[23] and (4) that similarly situated employees outside the protected class received more

favorable treatment. *See Gerner v. Cty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012). In the

event plaintiff establishes a *prima facie* case, defendant may rebut that case by articulating a

---

[22] Direct evidence is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Johnson v. Mechs. & Farmers Bank*, 309 F. App'x. 675, 681 (4th Cir. 2009) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)). Discriminatory statements standing alone are insufficient to state a claim; a plaintiff must also show "a nexus between the discriminatory statements and the employment action." *See Hill v. Lockheed Martin Logistics Mgmt.*, Inc., 314 F.3d 657, 665 (4th Cir. 2003). In other words, evidence is "direct" if it "proves [the] existence of [discriminatory intent] without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (internal marks and citation omitted). Although the summary judgment record contains substantial evidence that some of Johnson's employees at USAG Yongsan made gender discrimination complaints against Johnson in 2011, plaintiff has produced no evidence linking those discriminatory statements Johnson allegedly made to other women in 2011 to any purported adverse employment action against her in 2015 or 2016, over four years later. With respect to plaintiff's specific allegations regarding Johnson's actions as her supervisor in 2015 and 2016, the summary judgment record contains no evidence that Johnson ever stated that any action he took was because of her gender. Thus, Johnson's alleged actions in 2015 and 2016 do not prove, without inference or presumption, that plaintiff suffered an adverse employment decision because of Johnson's alleged discriminatory attitude toward women.

[23] The Fourth Circuit has held that "the general level of decision...contemplated by the term 'personnel actions'...[is] what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981). But less severe action may qualify as an adverse employment action if "the terms, conditions, or benefits of [plaintiff's] employment were adversely affected." *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997).

The Supreme Court altered the scope of the adverse action requirement for Title VII's anti-retaliation provision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), but the adverse action requirement for Title VII's substantive discrimination provisions has remained the same. *See White*, 548 U.S. at 67 ("Title VII's substantive provision and its antiretaliation provision are not coterminous. The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."). Thus, the *Page* and *Munday* standard for Title VII disparate treatment claims based on substantive discrimination remains applicable Fourth Circuit law in the gender discrimination context. *See Cooper v. Smithfield Packing Co.*, 724 F. App'x 197, 202 (4th Cir. 2018) (applying the *Page* standard).

legitimate, non-discriminatory justification for the adverse personnel action. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). To overcome the legitimate, nondiscriminatory justification provided by defendant, plaintiff must establish that the proffered justification is pretextual. *Id.*

The first two elements of a *prima facie* case of disparate treatment are uncontested; plaintiff's sex is a protected class, and there is no reasonable dispute that plaintiff performed her job satisfactorily. Nevertheless, no triable issue of fact exists as to the third element of a disparate treatment claim because the summary judgment record does not establish that plaintiff suffered an adverse personnel action. The majority of plaintiff's complaints relate to disagreements with Johnson's management style.[24] But settled authority makes clear that "negative comments and reprimands, without collateral consequences[,] do not constitute adverse actions." *Michael v. Virginia Commonwealth Univ.*, No. 3:18-CV-125, 2018 WL 3631888, at \*3 (E.D. Va. July 31, 2018).[25] Johnson's harsh, authoritarian management-style did not produce collateral consequences that amounted to an adverse personnel action.

Plaintiff's other assertions of Johnson's disparate treatment of her fare no better. For example, denial of a single training opportunity does not satisfy the adverse personnel action element unless the denial "had a significant detrimental effect on her or her employment status or w[as] otherwise materially adverse," a showing not made here. *Chapman v. Geithner*, 2012 WL 1533514, at \*22 (E.D. Va. 2012), *aff'd* 507 F. App'x 299 (4th Cir. 2013) (finding that an employer's denial of training opportunities and developmental work assignments did not amount

---

[24] *See* Material Facts 22(a), (b), (e), (g), (h), (k), (l), (n).

[25] *See also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("petty slights, minor annoyances, and simple lack of good manners" do not constitute adverse actions under Title VII); *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015) (written and verbal reprimands did not qualify as adverse employment actions where they did not lead to further discipline).

to an adverse action).[26] Plaintiff has pled no facts that show how she was harmed by Johnson's denial of this single training opportunity. In sum, none of the actions plaintiff claims occurred during Johnson's supervision of her from August 2015 to April 2016 altered the terms or conditions of plaintiff's employment, and therefore none of the actions satisfies the adverse personnel action element of a Title VII gender discrimination claim. *See Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (requiring "evidence that the terms, conditions, or benefits of [plaintiff's] employment were adversely affected" to establish an adverse employment action).

Moreover, the summary judgment record does not establish the fourth element of a disparate treatment claim, namely that similarly situated employees outside the protected class received more favorable treatment than plaintiff received. To the contrary, the summary judgment record establishes that both men and women consistently complained about Johnson's management style at each of Johnson's two prior supervisory positions before becoming plaintiff's first-line supervisor in August 2015.[27] Specifically, male and female employees under Johnson's supervision at USAG Yongsan from 2010-2011 almost uniformly reported that

---

[26] *See also Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002) (rejecting employee's argument that denial of certain training opportunities prevented him from being promoted as "sheer speculation" and finding the denial of training opportunities did not qualify as an adverse employment action); *Jensen-Graf v. Chesapeake Emp'rs' Ins. Co.* 616 F. App'x 596, 598 (4th Cir. 2015) (finding that denial of a single training course was not an adverse action when plaintiff pled no facts indicating whether the course was required for her professional development or showing how she was harmed by the denial of the opportunity to take the course).

[27] There were also significant gender discrimination complaints made by some of Johnson's employees at USAG Yongsan in 2011. Those gender discrimination allegations dealt with specific alleged instances of Johnson making derogatory comments about a female employee's appearance or attire. In that respect, those allegations are categorically different from the allegations brought by plaintiff in this case. Here, plaintiff does not allege that Johnson made comments regarding her appearance or attire. Instead, plaintiff alleges that Johnson continually criticized her work and role, closely monitored all of her work activity, and made comments to the entire staff about gossip and complaining that did not specifically single anyone out. These allegations about Johnson's management style are categorically different from the prior allegations regarding offensive sexist comments allegedly made by Johnson.

Johnson's management style was "authoritarian," "dictatorial," "micro-managing," and "my-way-or-the-highway."[28] In addition, a male employee under Johnson's supervision at West Point reported in 2014 that Johnson micro-managed him, yelled at him in a "one-way conversation," and insisted that employees attend impromptu meetings without regard to the employees' schedules.[29]

Plaintiff's allegations mostly consist of conclusory statements that Johnson treated her in the harsh and disrespectful manner that he did because of her gender. Plaintiff's only specific allegations that Johnson treated her differently because of her status as a woman are that plaintiff had to take notes in a meeting one time because another female colleague could not, and that plaintiff and her female colleague were the only staff members who were not invited to Johnson's house for Thanksgiving.[30] Defendant disputes these allegations by providing evidence that at least one male employee had to take meeting notes and by relying on Johnson's deposition testimony that he invited all staff to his house for Thanksgiving. These two disputed incidents, even assuming Johnson treated men differently from his treatment of women on those two specific occasions, do not amount to the type of adverse personnel action necessary to establish a *prima facie* case of disparate treatment based on gender. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (holding that an "adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment" and finding that a new job assignment must have some significant detrimental

---

[28] *See* Material Fact 7.

[29] *See* Material Fact 13.

[30] *See* Material Fact 22(i), (o).

effect to constitute adverse action, not merely be less appealing to the employee).[31] Here, the summary judgment record does not establish that these two events, which plaintiff has alleged occurred, had any tangible effect on the terms or conditions of her employment. To the contrary, the summary judgment record makes clear that none of Johnson's alleged actions toward plaintiff generated any of the typical forms of adverse action: "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

Accordingly, summary judgment must be entered in favor of defendant on Count 2, plaintiff's claim of disparate treatment based on gender.[32]

## V.

Counts 3 and 4 of plaintiff's complaint allege claims of disability discrimination and of failure to accommodate based on plaintiff's panic anxiety disorder. Because plaintiff has failed to produce sufficient evidence in the summary judgment record to establish that she has a disability as that term is defined in the Rehabilitation Act, summary judgment must be entered in favor of defendant on Counts 3 and 4.

As a threshold matter, a plaintiff seeking relief pursuant to the Rehabilitation Act[33] for

---

[31] *See also Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 591 (D. Md. 2012) (finding that an "'isolated incident' of lifting heavy boxes while her male co-workers laughed" is not an actionable adverse employment action).

[32] It is worth noting that plaintiff provided no response to defendant's arguments in its summary judgment motion regarding plaintiff's disparate treatment claim based on gender. In such circumstances, "many courts within the Fourth Circuit, as well as other circuits, have held that a plaintiff's failure to respond to a summary judgment motion constitutes waiver or abandonment of a claim." *Orbit Corp. v. Fedex Ground Package Sys., Inc.*, 2016 WL 6609184, at *15 (E.D. Va. Nov. 8, 2016) (collecting district court cases). Here, defendant is entitled to summary judgment on Count 2 as a matter of law based on the merits, but plaintiff has also abandoned her claim by not responding to defendant's motion for summary judgment with respect to this claim.

[33] The standards used to determine whether an employer has discriminated under the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 *et seq.*, and the provisions of sections 501 through 504, and 510 of the ADA, 42 U.S.C. §§ 12201–12204 and 12210. *See* 29 U.S.C.

discrimination or failure to accommodate must establish disability. *Perry v. Kappos*, 489 F.

App'x 637, 640 (4th Cir. 2012). The ADA defines "disability" as "(A) a physical or mental

impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or (C) being regarded as having such an impairment." 42

U.S.C. § 12102(1). EEOC regulations define the phrase "major life activities" to include "caring

for oneself, performing manual tasks,…communicating, interacting with others, and working."

29 C.F.R. at 1630.2(i). To establish disability, a plaintiff must prove "(1) that [s]he has a physical

or mental impairment, (2) that this impairment implicates at least one major life activity, and (3)

that the limitation is substantial." *Id.* (quoting *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d

249, 254 (4th Cir. 2006)). Importantly, an employer must be aware of an individual's disability

for liability to exist. *Estate of Hoffman v. Baltimore City Pub. Schs.*, 1999 WL 61965, at *1 (4th

Cir. Feb. 10, 1999) (unpublished) (citing *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th

Cir. 1995).

    Here, plaintiff alleges that her panic anxiety disorder affected her ability to work with

Johnson and that her employer failed to accommodate her disability by refusing to remove her

from Johnson's supervision. But it is well-established that the inability to work with particular

co-workers or supervisors does not create a substantial limitation on the major life activity of

working. *See Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524–25 (7th Cir. 1996) ("The major

life activity of working is not 'substantially limited' if a plaintiff merely cannot work under a

certain supervisor because of anxiety and stress" and if plaintiff "can do the same job for another

supervisor, she can do the job, and does not qualify under the ADA").[34] In her deposition,

---

§ 791(g); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001).

[34] *See also Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 703-04 (4th Cir. 2001) ("[O]ne is not substantially limited in the major life activity of working unless one is barred from generally obtaining employment of a given type, as

plaintiff stated repeatedly that her disability did not impact her ability to do her job.[35] Stress and anxiety resulting from a plaintiff's poor relationship with a supervisor is not a disability as that term is defined in the Rehabilitation Act where, as here, a plaintiff has the ability to complete all work responsibilities. Accordingly, plaintiff's panic anxiety disorder does not qualify as a physical or mental impairment that substantially limits the major life activity of working.

Moreover, the summary judgment record establishes that plaintiff did not have a record of such an impairment and was not regarded as having such an impairment. Plaintiff argues that Rader, the head of human resources at USAG Red Cloud, was aware of plaintiff's anxiety condition and that Rader granted plaintiff a reasonable accommodation when plaintiff called Rader while having a panic attack in Johnson's office. In Rader's declaration, however, he averred that he asked plaintiff to provide medical documentation of her condition, and plaintiff never did so.[36] Moreover, plaintiff testified in her deposition that she never provided the Army with any documentation regarding her panic anxiety disorder. With respect to plaintiff's panic attack in Johnson's office, Rader merely allowed plaintiff to take sick leave when she informed him of the panic attack. A supervisor's knowledge of a single panic attack is insufficient to establish disability under the Rehabilitation Act. *See Haulbrook v. Michelin N. Am.*, 252 F.3d

---

opposed to being barred from a specific job"); *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir. 1997) (holding that a mental impairment preventing plaintiff from "working under a few supervisors within the organizational structure of one major corporation...is far too narrow to constitute" a substantial limitation on the major life activity of working); *Palmer v. Circuit Court of Cook Cty.*, 117 F.3d 351, 352 (7th Cir. 1997) ("[A] personality conflict with a supervisor or coworker does not establish a disability within the meaning of the disability law,...even if it produces anxiety and depression, as such conflicts often do."); *Frantz v. Shinseki*, No. 1:10CV275, 2012 WL 259980, at *8 (M.D.N.C. Jan. 27, 2012) (nurse failed to establish that her stress and anxiety substantially limited any major life activity when all she requested was to be transferred to different supervisors).

[35] Although plaintiff suffered a panic attack during a meeting with Johnson, the medical documentation in the record shows that plaintiff received medication to treat that condition. There is no evidence in the record that plaintiff's panic anxiety disorder further impacted her ability to perform her job other than plaintiff's desire not to be supervised by Johnson.

[36] *See* Dkt. 60-18, at 3-4, 8, 10-11, 21.

696, 703 (4th Cir. 2001) ("The fact that an employer is aware of an employee's impairment, without more, is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action."). Accordingly, there was no record of plaintiff having any impairment or being regarded as having any impairment.

Thus, plaintiff has failed to produce sufficient evidence in the summary judgment record to establish that she is disabled as that term is defined in the Rehabilitation Act. Accordingly, summary judgment must be entered in favor of defendant on Counts 3 and 4 of plaintiff's complaint.

### VI.

Count 5 of plaintiff's complaint alleges the creation of a hostile work environment as a result of unwelcome harassment related to plaintiff's gender and disability. For the reasons set forth below, summary judgment must be granted in favor of defendant with respect to plaintiff's gender and disability-based hostile work environment claims.

For her gender and disability-based hostile work environment claims to survive summary judgment, plaintiff must show that a reasonable jury could find that the alleged conduct by her supervisor: (1) was unwelcome; (2) was based on her protected class; (3) was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment; and (4) was imputable to her employer. *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495–96 (4th Cir. 2015); *Baqir v. Principi*, 434 F.3d 733, 745 (4th Cir. 2006)).

### A.

Plaintiff's disability-based hostile work environment claim is dead on arrival. As noted in Part V *supra*, the summary judgment record does not establish that plaintiff has a disability as that term is defined in the Rehabilitation Act. Accordingly, plaintiff cannot establish the second

element of a hostile work environment claim based on disability because the summary judgment

record does not establish that plaintiff is a member of the class of people protected pursuant to

the Rehabilitation Act. Thus, summary judgment must be entered in favor of defendant on

plaintiff's disability-based hostile work environment claim.

**B.**

Similarly, with respect to plaintiff's gender-based hostile work environment claim, the

summary judgment record does not establish that Johnson's unwelcome conduct toward plaintiff

was based on her gender. Although plaintiff perceived many of Johnson's comments, and his

controlling supervisory style in general, as personal slights, there is no indication that the vast

majority of Johnson's actions had anything to do with plaintiff's gender.[37] *See Hartsell v. Duplex*

*Prod., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) ("We have made clear that only harassment that

occurs because of the victim's gender is actionable" in the context of a hostile work environment

claim based on gender).

Here, the only non-conclusory allegations based on plaintiff's gender are that plaintiff

had to take notes in a meeting one time because another female colleague could not, and that

plaintiff and her female colleague were the only staff members who were not invited to

Johnson's house for Thanksgiving.[38] In the context of plaintiff's broader allegations related to

Johnson's domineering supervisory persona, these two specific instances of perceived

unwelcome conduct based on plaintiff's gender are insufficient for any reasonable jury to find

that such conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's

---

[37] *See* Part IV *supra* and *supra* note 30 and accompanying text.

[38] The Fourth Circuit has repeatedly indicated that at the summary judgment stage it is appropriate to disregard conclusory statements and focus only on those allegations that indicate animosity based on protected characteristics or activity. *See Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142-43 (4th Cir. 2007); *Baqir v. Principi*, 434 F.3d 733, 746-47 (4th Cir. 2006); *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).

employment and to create an abusive work environment. Accordingly, summary judgment must be entered in favor of defendant on plaintiff's gender-based hostile work environment claim.

## VII.

Count 1 of plaintiff's complaint alleges that Johnson harassed plaintiff because of plaintiff's prior Title VII-protected activity and that Johnson's retaliatory harassment created a hostile work environment for plaintiff. Defendant's motion for summary judgment treats Count 1 as two separate claims—a substantive retaliation claim and a retaliation-based hostile work environment claim, but plaintiff's opposition to defendant's motion treats Count 1 as a single claim—namely, a retaliation-based hostile work environment claim. Count 1 of plaintiff's complaint, although not pellucidly clear, is best read as a retaliation-based hostile work environment claim, and it will be treated as such.[39] For the reasons that follow, defendant's motion for summary judgment on plaintiff's retaliation-based hostile work environment claim must be denied.

As noted, for a hostile work environment claim to survive summary judgment, plaintiff must show that a reasonable jury could find that the alleged conduct by her supervisor: (1) was unwelcome; (2) was based on her prior protected activity; (3) was sufficiently severe or

---

[39] If Count 1 were to be read as a substantive retaliation claim, the result would not be different. To establish a *prima facie* case of retaliation, plaintiff must prove three elements: (1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008). There is disagreement about whether the Supreme Court's decision regarding the scope of the adverse action requirement in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) applies to federal employees. *See id.* This case would not require resolution of that disagreement, however, because the Fourth Circuit has made clear that "retaliatory harassment can constitute adverse employment action" under the narrower adverse action standard applied in retaliation cases prior to the Supreme Court's decision in *White*. *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001), *overruled on other grounds by White*, 548 U.S. 53 (2006). Thus, because retaliatory harassment can constitute an adverse action under the narrower adverse employment action standard, it can certainly constitute a materially adverse action that could dissuade a reasonable worker from making a charge of discrimination. *See White*, 548 U.S. at 68. Under either standard, retaliatory harassment can constitute an adverse action, and considering the summary judgment record in the light most favorable to plaintiff, a reasonably jury could find that Johnson's retaliatory harassment constituted an adverse action against plaintiff here.

pervasive to alter the conditions of her employment and to create an abusive work environment; and (4) was imputable to her employer. *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495– 96 (4th Cir. 2015); *Baqir v. Principi*, 434 F.3d 733, 745 (4th Cir. 2006)). Stated differently, a hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted) (quotation marks omitted). In other words, hostile work environment claims "are based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

First, it is abundantly clear that Johnson's supervisory conduct toward plaintiff was unwelcome. Plaintiff suffered a panic attack in Johnson's office in part because of the stress and anxiety that her interactions with Johnson were causing her. Second, the summary judgment record shows that plaintiff had some level of involvement in three prior EEOC cases filed against Johnson during his earlier stint in Korea—as at least a potential witness in two cases in 2010-2011 and as a complainant in one case in 2011. Plaintiff erroneously believed that her settlement agreement from her 2011 EEOC complaint contained a "no contact" provision that prevented Johnson from ever supervising her again. Because of plaintiff's mistaken belief that Johnson could never supervise her again, plaintiff informed senior management at USAG Red Cloud about her prior EEOC activity immediately upon learning that Johnson was to be her supervisor in August 2015. Subsequently, USAG Red Cloud senior management investigated plaintiff's assertion that her EEOC settlement agreement prevented Johnson from supervising her, found out that plaintiff's EEOC settlement agreement contained no such provision, and did not grant plaintiff's request not to be supervised by Johnson.

Thereafter, plaintiff alleges that Johnson continually harassed her until her retirement in April 2016. Some of this alleged harassment is certainly attributable to the domineering supervisory-style with which Johnson treated all employees, but a reasonable jury could find that a significant portion of the alleged harassment in this case targeted plaintiff more than her colleagues because of plaintiff's history of EEOC activity with Johnson. Accordingly, these circumstances are sufficiently severe for a reasonable jury to find that they created a hostile work environment for plaintiff.

The instances of alleged harassment against plaintiff specifically, as opposed to all of Johnson's employees generally, include:

- In Johnson's first staff meeting on August 28, 2015, Johnson stated he was not aware of plaintiff's specific duties as Suicide Prevention Program Manager.

- In the same meeting, Johnson told plaintiff that she could not attend trainings that involved travel because she was retiring soon.

- In a meeting on September 14, 2015, Johnson interrogated plaintiff about the specific details regarding her plans for the Suicide Prevention Month Campaign, which was scheduled to begin in two weeks. Johnson ended up cancelling a significant portion of the Suicide Prevention Month Campaign.

- When plaintiff returned to work two days after having a panic attack in Johnson's office, Johnson again scheduled a meeting with plaintiff in his office. Plaintiff requested that Dr. Clem be present during their meeting, but Johnson refused to have anyone else present for the meeting.

- Johnson gave plaintiff a hard time for using the term "manager" in her email signature line as part of her job title, even though manager is in her position title (Suicide Prevention Program Manager).

- Johnson insisted that, as Chief of the ASAP, he would be the primary interface between senior command officials, and that plaintiff brief him for meetings with senior command. Prior to Johnson becoming her supervisor, plaintiff had been the primary interface in some of these senior command meetings.

- When Johnson learned that plaintiff maintained a cellular telephone with a 24-hour suicide crisis hotline, he asked plaintiff what qualification she had to staff that hotline.

These allegations are sufficient for a reasonable jury to find that Johnson's conduct toward plaintiff represented more than "standard, managerial acts" that may take place in any workplace setting. *See Fordyce v. Prince George's Cty. Md.*, 43 F. Supp. 3d 537, 553 (D. Md. 2014). Moreover, any argument that Johnson's conduct toward plaintiff was not severe or persuasive is belied by the fact that Johnson insisted on knowing plaintiff's whereabouts and what she was working on every single day that Johnson was her supervisor.

Finally, it is well-settled that an employer may be liable for hostile work environments created by a supervisor "if it knew or should have known about the harassment and failed to take effective action to stop it...[by] respond[ing] with remedial action reasonably calculated to end the harassment." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008) (internal quotation marks omitted). Here, although defendant admits its knowledge of plaintiff's prior protected activity against Johnson, defendant contends that plaintiff never told Red Cloud Garrison Commander Colonel Jack Haefner or Deputy Garrison Commander Steve Ryan about any of Johnson's alleged harassment after August 2015. Defendant thus argues that it had no notice of Johnson's alleged harassment of plaintiff between August 2015 and April 2016.

Defendant's argument is unpersuasive. First, the Supreme Court has held that in certain circumstances employers can be subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate authority over the employee. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). In addition, Bud Rader, the head of HR at USAG Red Cloud, was at least made aware of the incident in which plaintiff suffered a panic attack in Johnson's office and had to take sick leave. Knowledge of plaintiff's panic attack provided notice to senior management and should have at least triggered some further investigation into the supervisory relationship between Johnson and plaintiff. At the

summary judgment stage, considering the evidence in the light most favorable to plaintiff as the non-movant, this record contains sufficient evidence such that a reasonable jury could find that Johnson's conduct is imputable to his employer.

For these reasons, defendant's motion for summary judgment on plaintiff's retaliation-based hostile work environment claim must be denied.

## VIII.

For the reasons set forth above, defendant's motion to dismiss will be granted, and defendant's motion for summary judgment will be granted in part and denied in part.

An appropriate order will issue separately.

The Clerk is directed to provide a copy of this Opinion to all counsel of record.


Alexandria, Virginia
February 13, 2020

T. S. Ellis, III
United States District Judge